STATE, EX REL. EDSON PENNELL, V. C. D. ARMSTRONG.

[FILED SEPTEMBER 30, 1890.] ·

1. **New Counties**: FORMATION: CONFLICTING PROPOSITIONS. A county board cannot lawfully submit, to be voted upon at the same election, two propositions to erect from a county two new counties, when the territory described in one proposition embraces a part of that included in the other. When conflicting petitions for the submission of the question of creating new counties are presented, it is the duty of the county board to grant the petition that is first filed, provided it meets all the requirements of the law, and refuse to submit the others.

2. ———: ———: AREA. New counties cannot be formed so as to reduce the county from which they are created to a less area than the constitutional limit.

ORIGINAL application for *mandamus*.

*J. C. Crawford*, for relator, cited: *State v. Newman*, 24 Neb., 40; *People v. Auditors*, 41 Mich., 223; Dillon Mun. Corp. [3d Ed.], secs. 825, 830, 845–6.

*E. F. Gray, contra.*

NORVAL, J.

This is an application for a writ of *mandamus* to require the board of supervisors of Knox county to submit to the electors of said county the proposition to erect the county of Union out of the territory now within the boundaries of the county of Knox. On the 9th day of July, 1890, a petition, signed by the relator and 606 other legal voters of Knox county, was filed with the county clerk of that county, and on July 15, 1890, another petition, signed by thirty-one electors of said county, was filed with said clerk, which petition prayed that the respondents, the board of supervisors, submit to the electors of

said county at the next general election a proposition to erect the county of Union out of the two southern tiers of government townships of Knox county. All of said petitioners were residents and legal voters of the territory out of which it is proposed to erect the new county, and it is alleged that they constitute a majority of the electors residing in said territory. It also appears that the proposed Union county comprises the extent of territory required by the constitution and laws, and the remainder of Knox county has more territory than is required by the constitution and laws. ·

On July 14 thirty of the persons who signed the above petitions filed with the county clerk a remonstrance, and requested that their names be erased from said petitions. On July 15 these petitions were presented to the board of supervisors while in regular session, and were by said board referred to a committee appointed from the membership of the board, to ascertain and report to the full board whether said petitions contained the names of a majority of the electors residing in the proposed Union county. On the next day the committee reported to the board that said petitions contained the names of a majority of the legal voters residing in the territory proposed to be stricken from Knox county, after deducting the names of the thirty petitioners who asked to have their names stricken from the petitions. The respondents refused to grant the prayer of said petitions.

On July 14, 1890, a petition was filed with the county clerk signed by 259 electors of Knox county, and on July 15 there was filed with said clerk another petition signed by thirty-seven legal voters of said county praying for the erection of Alliance county out of three of the eastern tiers of government townships of Knox county. On July 16 the respondents ordered submitted to a vote of the people at the next general election the proposition to create Alliance county, which county includes in its boundaries a

portion of the territory proposed to be included in the county of Union. The relator prays for a *mandamus* to require the respondents to submit to a vote, the proposition to create Union county, and compel them to recall the proposition to erect Alliance county.

Sections 1, 2, and 3 of article 10 of the constitution are as follows:

"Section 1. No new county shall be formed or established by the legislature which will reduce the county, or counties, or either of them, to a less area than four hundred square miles, nor shall any county be formed of a less area.

"Sec. 2. No county shall be divided, or have any part stricken therefrom, without first submitting the question to a vote of the people of the county, nor unless a majority of all the legal voters of the county voting on the question shall vote for the same.

"Sec. 3. There shall be no territory stricken from any organized county unless a majority of the voters living in such territory shall petition for such division, and no territory shall be added to any organized county without the consent of the majority of the voters of the county to which it is proposed to be added."   *   *   *

Section 10 of article 1, chapter 18, of the Compiled Statutes of 1889 provides that, "Whenever it is desired to form a new county out of one or more of the then existing counties, and a petition praying for the erection of such new county, stating and describing the territory proposed to be taken for such new county, together with the name of such proposed new county, signed by a majority of the legal voters residing in the territory to be stricken from each county or counties, shall be presented to the county board of each county to be affected by such division, and it appearing that such new county can be constitutionally formed, it shall be the duty of such county board, or county boards, to make an order providing for the submission of

the question of the erection of such new county to a vote of the people of the counties to be affected, at the next succeeding general election, of which the notice shall be given, the votes canvassed, and the returns made as in case of election of county officers, and the form of the ballot to be used in the determination of such question shall be as follows : ' For new county,' and 'Against new county.' "

It is conceded by the respondents that the petitions presented to the county board for the creation of Union county meet all the requirements of the above quoted sections of the constitution and the statutes excepting one. It is insisted by the respondents that it does not appear that these petitions contain the signatures of a majority of the qualified voters residing in the territory out of which it is proposed to erect the new county.   If this be true, it is an insurmountable objection to the granting of the relief demanded by the relator, for, without the requisite number of petitioners, the county board would be without jurisdiction to act.

The relator, in his petition for *mandamus*, alleges that the petitions submitted to the county board, asking for the creation of Union county, contained the signatures of a majority of the legal voters residing in the proposed county, and that there are not more than 1,000 legal voters in said territory.

The respondents in their answer " deny that the two petitions for the creation of Union county contained any greater number than 607 names after deducting the names of those who asked to have their names stricken therefrom in their said remonstrance, and deny that said number was, at the time of their action thereon aforesaid, or now is, a majority of the legal voters residing in the territory comprising the said proposed Union county; deny that the proposed Union county did not, at the time of filing said petitions, or does not now, contain more than 1,000 legal voters."   If there were before us nothing but the petition

and answer, the denials in the answer would compel the dismissal of the action.    Does the proof show that the petitions for the creation of Union county were signed by a majority of the legal voters residing therein?    It is alleged in the petition, and not controverted by the answer, that the proposed Union county comprises the townships of Walnut Grove, Logan, Verdigris, Jefferson, Miller, Creighton, Valley, Central, Cleveland, Lincoln, and the south thirty-six square miles of Dolphin and the south eighteen square miles of Washington and Morton.    There are attached to both the petition and the answer certified copies of the abstracts of the total votes cast in said townships at the general election held in November, 1889, for the office of judge of the supreme court, and for and against township organization, from which abstracts it appears that the total vote cast in said townships for judge of the supreme court was 1,019, and 909 votes were cast therein on the question of township organization.    These abstracts include the votes cast in Dolphin, Washington, and Morton townships by those residing in said township north of the north line of the proposed Union county. There is also attached to the answer a certified copy of the abstract of the vote cast in said townships at a special election held therein on August 13, 1887, which shows the total vote cast at that election to be 1,334.    It appears from this abstract that one-third of Central township and two-thirds of two other townships as then constituted are not included in the territory comprising the proposed Union county.    Deducting from the total vote cast at that election fifty votes, being one-third of the votes cast in Central township, and ninety-four, being two-thirds of the votes cast in the two other townships, would leave 1,190 votes cast in 1887 in the territory comprising the proposed new county of Union.    All of these abstracts of votes were before the board of supervisors, at the time they declined to submit to the voters the question of creating Union

county. But that is not all. There were likewise presented to the board of supervisors before they took action upon the petitions, the affidavits of five residents of Creighton township in Knox county, wherein each deposed that all the names signed to the petition praying for the erection of Union county are of legal voters residing in said territory, and constitute a majority of all the legal voters residing therein, and that there is not to exceed 1,000 legal voters residing in the proposed county. The abstracts of votes and these affidavits constituted the entire testimony before the county board, and on the hearing in this court. Without any showing to the contrary, this testimony was sufficient to establish that the proposed Union county did not contain more than 1,000 legal voters. In addition to this, we have the report of the committee to whom the board of supervisors referred the Union county petitions. This report finds that the petitions were signed by a majority of the electors residing in the territory comprising the proposed new county. The two Union county petitions contained the names of 607 legal voters after deducting the thirty signers who subsequently requested that their names be stricken from the petitions. This is a majority of all the legal voters residing in the territory comprising the proposed county.

It is urged that it was not for the best interests of the citizens of Knox county that the proposed Union county should be created, and that the petitions for the creation of that county conflict with those granted by the respondents for the erection of Alliance county, in that part of the same territory is included in both sets of petitions. The law is mandatory. When a petition is presented to a county board asking for the creation of a new county which in all respects complies with the law, and contains the requisite number of petitioners, it is the duty of the county board to submit the question to a vote of the people of the county. The law confers no discretion in the matter upon the county board.

Was it the duty of the respondents to submit to a vote the proposition to create Union county after having ordered the submission of the proposition to create Alliance county? The authority of the county board to submit at the same election more than one proposition to create new counties was sustained by this court in the case of *State v. Newman*, 24 Neb., 40. It appears from the statement of facts in that case that the county board of Cheyenne county had submitted to the voters of that county the proposition to create the counties of Kimball, Deuel, Banner, and Scott's Bluff out of the territory embraced in Cheyenne county. Before the general election was held, at which said questions could be voted upon, a proper petition was presented to the county board of Cheyenne county praying that the proposition to establish the county of Potter be submitted to a vote at the same election. The county board refused to permit a vote to be taken thereon. On application to this court a *mandamus* was issued requiring the county board to submit the question of the proposed new county of Potter to a vote of the electors of Cheyenne county. It is stated in the syllabus in that case that "When it is sought to erect from a county more than one new county, and petitions for the submission of the proposition to erect such new counties are severally presented, they may be separately submitted at the same election, without reference to the number of propositions to be voted upon thereat." We adhere to that decision. But the facts in that case are so different from those presented by the record before us, that that decision does not afford us any assistance in determining whether the propositions to create Union and Alliance counties could both be lawfully submitted to a vote at the same election. It will be noticed that each of the proposed new counties contains territory embraced in the other. To be effective, it is clear but one of the propositions can be adopted. The questions are independent, and we are not aware of any

law or statute that would prevent an elector from voting for both propositions. If each should receive the requisite vote, being irreconcilable and conflicting, both would be defeated. The legislature never intended that such conflicting propositions should be submitted to a vote at the same election. It is certain that a fair construction of the language used in section 10 of the statute, above quoted, will not sanction the submission of such conflicting petitions.

There is another very good reason why both propositions could not legally be submitted at the same election. The territory embraced in the proposed new counties of Union and Alliance would reduce the area of the county of Knox below that required by the constitution. The constitution provides that no new county shall be formed which will reduce the county to a less area than four hundred square miles, nor shall a county be formed of a less area. It logically follows that the petitions to create new counties cannot be submitted when the territory included therein will leave the original with an area less than the constitutional limit.

Having reached the conclusion that the county board had no authority to require a vote to be taken on both propositions, the question arises, Which one should have been submitted to a vote? It is conceded that the petitions for the creation of Alliance county were signed by a majority of all the legal voters residing in the territory embraced in the petitions; that such territory has over four hundred square miles, and that the remainder of Knox county was more than the constitutional requirements. The question of creating Alliance county could, therefore, have lawfully been submitted had not the petitions praying for the formation of Union county been presented. The record shows that the Union county petition, containing 607 names, was filed with the county clerk of Knox county on July 9, and after deducting the names

of those who signed a remonstrance contained a majority of the voters residing within the proposed Union county. The first Alliance county petition was not filed until July 14, and it did not contain sufficient signers. On the day following a second Union county petition was filed, also another petition for the creation of Alliance county. Thus it will be seen that those who petitioned for the erection of Union county would have been entitled to have had that question submitted had the board been in session before the petitions for the creation of Alliance county were filed. It makes no difference that the petitions last filed were first circulated and signed, as no duty rested upon the respondents until filed. The fact that the board of supervisors have submitted the Alliance county proposition does not relieve them of the obligation to submit the proposition first presented to the board. The respondents had no authority to submit the question of creating Alliance county.

A peremptory writ of *mandamus* will issue as prayed.

WRIT ALLOWED.

THE other judges concur.